```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
ELIOT F. BLOOM,

                    Plaintiff,

        -against-                          MEMORANDUM & ORDER
                                           10-CV-1473(JS)(ETB)
C. BLAINE MORLEY,

                    Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:    Eliot F. Bloom, Esq. *representing himself
                  Hillside Professional Center, Bldg. B
                  2 Hillside Avenue
                  Williston Park, NY 11596

For Defendant:    John E. Lawlor, Esq.
                  129 Third Street
                  Mineola, NY 11501
```

SEYBERT, District Judge:

Plaintiff Eliot F. Bloom ("Plaintiff") sued Defendant C. Blaine Morley ("Defendant") for tortious interference with a contract. Pending before the Court is Defendant's motion for summary judgment. (Docket Entry 33.) This motion is GRANTED.

BACKGROUND

In 2006, Plaintiff entered into a joint venture with two third-parties: Northwestern Consultants, Inc. ("NWC") and its president, Russell Lugli. (Compl. ¶ 3.) The purpose of the joint venture was to buy, develop, and re-sell property in Bay Shore, New York (the "Project"). (Id.) Plaintiff, an attorney,

agreed to perform all legal services in connection with the Project.

A year later, NWC and Lugli bought Plaintiff out of his share of the joint venture. Under the so-called "Withdrawal Agreement," NWC and Lugli agreed to pay Plaintiff $450,000 for his interest in the Project; in exchange, Plaintiff--who had not contributed any financial support to the joint venture--agreed to continue representing the joint venture so that the Project could be completed. (Id. ¶¶ 5-6.)

At some point,[1] NWC and Lugli hired another lawyer--Defendant--and the record evidences a good deal of bickering between him and Plaintiff. In November 2008, there was an exchange of emails that, to say the least, reflects a breakdown of communication between the two over their joint efforts to represent NWC and Lugli in an unspecified litigation. (See generally Pl. Ex. D.) By May 2009, when the two were working together on the Project, it was clear that Defendant had lost all confidence in Plaintiff's ability to represent NWC and Lugli's interests in New York. (See, e.g., Pl. Ex. D, email dated May 13, 2009 ("Everything that Eliot has undertaken has

---

[1] Plaintiff disputes when Defendant was actually retained, largely in an effort to refute Defendant's argument that his conduct is shielded by California's judicial proceedings privilege. The precise date of Defendant's hiring is immaterial; the record is clear that Defendant was well involved in NWC and Lugli's affairs by late 2008.

2

been a failure or is clouded with so many small failures that the total effect will take years and/or a lot of money to undo.").) By June 2009, relations had apparently reached the breaking point. Defendant instructed Plaintiff to provide an accounting of NWC and Lugli's money and stated "[t]his is not just a request, it is a demand from your former client." (Pl. Ex. D, email dated June 15, 2009 at 6:04 p.m. (emphasis added).) Defendant further advised Plaintiff not to communicate directly with Lugli. (Id.) Also on June 15, Defendant wrote to the Suffolk County Treasurer's office to clarify NWC and Lugli's tax liability. In that letter, Defendant explained that: "If you are contacted by an attorney, Mr. Eliot Bloom, who claims to represent NWC, please do not deal with him. He is not authorized to represent the corporation." (Pl. Ex. N.) The next day, Defendant told Paul Fink, a representative of the Town of Islip Community Development Agency, that Plaintiff no longer worked for NWC. (Pl. Ex. E, email dated June 16, 2009.)

The precise scope of Defendant's responsibilities to NWC and Lugli is in dispute. According to Defendant, he was hired to investigate and litigate NWC and Lugli's potential claims against Plaintiff arising out of the Project and two securities transactions, the specifics of which are not relevant here. (See Def. Br. 3.) Plaintiff, on the other hand, asserts that Defendant worked on the Project and, in the process,

3

effectively cut Plaintiff out of the loop and thus made it impossible for Plaintiff to fulfill his obligation under the Withdrawal Agreement to continue providing legal services to the joint venture. Specifically, Paragraph 8 of Plaintiff's Complaint alleges that: "From approximately December 1, 2009 to present, Defendant has, without authority, continually and increasingly interjected himself in all matters pertaining to the development and/or sale of the Project." (Compl. ¶ 8.) Plaintiff lists specific instances of wrongdoing in his Complaint; his opposition brief, though, focuses on Defendant's contacting municipal officials about the Project.[2] (See Pl. Opp.[3]) And, as mentioned, Defendant did advise Paul Fink that Plaintiff was cut off from the matter.

NWC and Lugli, represented by Defendant, eventually sued Plaintiff in California for fraud in connection with the Project and the aforementioned securities transactions (the "California Action"). That case was eventually withdrawn, but there is related litigation pending in the Eastern District of

---

[2] For example, Plaintiff argues that his claims "are based upon the Defendant's communications with individuals and municipal officers in the State of New York before he was retained by his client, Russell Lugli, without authority, in an attempt to interfere with the contractual relationship between the Plaintiff and Lugli." (Pl. Opp.)

[3] Plaintiff's brief does not include page numbers.

New York. See Snider v. Lugli, No. 10-CV-4026(SJF)(AKT); Nw. Consultants, Inc. v. Bloom, No. 10-CV-5087(SJF)(AKT).

DISCUSSION

Plaintiff's sole cause of action is a claim for tortious interference with a contract. The Court first recites the law governing summary judgment and then turns to the substance of Defendant's motion.

I. Legal Standard Governing Summary Judgment Motions

Summary judgment is only appropriate where the moving party can demonstrate that there is "no genuine dispute as to any material fact" and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In considering this question, the Court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); FED. R. CIV. P. 56(c). "In assessing the record to determine whether there is a genuine issue to be tried . . . the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134. The burden of proving that there is no

genuine issue of material fact rests with the moving party. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994) (citing Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)). Once that burden is met, the non-moving party must "come forward with specific facts," LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998), to demonstrate that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "Mere conclusory allegations or denials will not suffice." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). And "unsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

II. Summary Judgment is Appropriate

Defendant principally argues that California's judicial proceeding privilege insulates his alleged conduct in this case. In the alternative, he argues (among other things) that Plaintiff cannot prove causation.

A. California Law Does Not Apply

Defendant argues that California law governs this case because Plaintiff's allegations grow out of steps that Defendant took to investigate and prosecute the California Action. (See Def. Reply 2.) This is an important point because California's

6

judicial proceeding privilege might protect Defendant from all claims arising from this conduct. See, e.g., AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 269-70 (2d Cir. 1992). Plaintiff, not surprisingly, views the case differently. He frames this action as arising virtually exclusively out of Defendant's communicating with municipal officials in an effort to freeze Plaintiff out of the Project. (See Pl. Opp.)

At least as to the choice-of-law issue, Plaintiff has the better argument. Defendant did more for NWC and Lugli than just pursue fraud claims; Defendant's assertion that he was retained for the "sole purpose of investigating the transactions between" Plaintiff, Lugli, and NWC mischaracterizes the record. (See Def. Reply 2.) The emails show that Defendant was involved in trying to resurrect the Project after it had apparently languished on Plaintiff's watch. (See Pl. Ex. E, email chain ending June 18, 2009.) It was Defendant's involvement in the Project that is the basis for this suit, and the California judicial proceedings privilege is inapplicable. Cf. AroChem, 968 F.2d at 270-71 (applying judicial proceeding privilege in suit arising out of defamatory statements made in Los Angeles-based negotiations to settle California litigation).

With the scope of Plaintiff's case thus limited, the next question is which state's law applies. New York is the obvious choice, not least because if California's judicial

7

proceedings privilege does not apply here, then Defendant has not established that there is an actual conflict between New York and California law. E.g., Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012). In any event, under New York's interest analysis test for choice-of-law issues in tort actions, New York law would apply because, among other things, the alleged interference took place in New York. See White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006).

B. Plaintiff Cannot Prove Tortious Interference

Under New York law, the elements of a tortious interference claim are (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of a breach of that contract without justification; (4) actual breach of the contract; and (5) damages. Oddo Asset Mgmt. v. Barclays Bank PLC, 19 N.Y.3d 584, --- N.E.2d ----, 2012 WL 2399815 (June 27, 2012); Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375, 646 N.Y.S.2d 76, 81-82 (1996). To prevail, plaintiffs also must demonstrate causation. See Lama Holding, 668 N.E.2d at 1375; Lansco Corp. v. Strike Holdings L.L.C., 90 A.D.3d 427, 428, 933 N.Y.S.2d 666, 667 (1st Dep't 2011).

Defendant argues that Plaintiff cannot establish causation. (See Def. Br. 15.) He argues that while Plaintiff's Complaint alleges that the wrongful conduct began in December 2009, the record is clear that Plaintiff's professional relationship with NWC and Lugli ended months earlier, in May or June 2009. (See id. (citing Compl. ¶ 8).) Plaintiff makes no attempt to refute this point, and the Court agrees with Defendant. Plaintiff's own evidence makes clear that his legal services were no longer welcome as of at least June 15, 2009. (Pl. Ex. D, email dated June 15, 2009 at 6:04 p.m. (noting that NWC and Lugli were "former" clients and advising Plaintiff not to have direct contact with Lugli).) This capped a months-long period during which Defendant had grave doubts about Plaintiff's competence as an attorney. (See generally Pl. Ex. D.) The same day, Defendant told the Suffolk County Treasurer not to deal with Plaintiff and, a day later, Defendant emailed Paul Fink that Plaintiff no longer worked for the joint venture (Pl. Ex. E, email dated June 16, 2009.) On the current record, no reasonable juror could conclude that Defendant's communications caused Plaintiff's relationship with the joint venture to sour; rather, the inescapable conclusion is that the soured relationship eventually resulted in communications.[4]

---

[4] Defendant had other contact with individuals in New York about the Project (e.g., Pl. Ex. I), but these contacts do not

9

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to close all pending motions and mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated: August  21 , 2012
       Central Islip, New York

---

evidence an attempt to cut Plaintiff out of the loop.